

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG:SEF
F.#2010R00578

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 5, 2011

By ECF and Hand

The Honorable Sandra L. Townes
United States District Judge
United States District Court
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Michael Virtuoso
Criminal Docket No. 06-800 (S-2)(SLT)

United States v. Michael Virtuoso
Docket No. M-11-673

Dear Judges Townes and Bloom:

The government respectfully submits this letter in support of its motion in the above-referenced cases for a permanent order of detention as to the defendant Michael Virtuoso, also known as "Mike the Butcher," on the grounds that Virtuoso is a danger to the community and poses a risk of flight. This morning, law enforcement agents arrested the defendant pursuant to an arrest warrant issued in connection with the above-captioned criminal complaint. In addition, this morning, the government filed a motion to revoke the defendant's term of supervised release.

BACKGROUND

The defendant has been an inducted member of the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family"), a criminal enterprise that routinely engages in

violence, for close to a decade. His criminal record dates back to a 1983 conviction in Kings County Supreme Court for attempted criminal possession of a weapon in the third degree.

I. 2008 Federal Conviction

On November 9, 2006, the defendant was arrested by agents of the Federal Bureau of Investigation ("FBI") and charged with conspiracy to commit extortionate collection of credit. The government moved for a permanent order of detention. Among other things, the government proffered that witness testimony would establish that Virtuoso personally threatened one of his victims that she would be killed if she did not repay a $100,000 loanshark debt. In addition, one of Virtuoso's co-conspirators, an inducted member of the Bonanno family, was recorded, inter alia, warning a cooperating witness that the debtor would be killed if she did not pay, stating that "either they're gettin' paid or she's going in the trunk of a car. Right now she's going in the trunk of a car."

Following an arraignment, the Honorable Roanne L. Mann rejected the defendant's proposed bail package of $1.7 million, secured by multiple properties and three suretors, and entered a permanent order of detention on the basis that the defendant represented a danger to the community. See United States v. Virtuoso, 06-M-1171, Dkt. No. 8. In so doing, Judge Mann found that the government had "established by clear and convincing evidence that the defendant participated in communicating threats to a loanshark victim and in attempting to locate her to carry out those threats." Id.

On December 6, 2006, Virtuoso and two co-conspirators were indicted by a grand jury in the Eastern District of New York on three counts of extortionate extension of credit, extortionate collection of credit, and extortionate collection of credit conspiracy. At the defendant's arraignment on the indictment on December 19, 2006, his revised proposed bail package of $5 million, secured by 12 properties, was granted by the Honorable Robert M. Levy, but the order was stayed pending the government's appeal. See United States v. Virtuoso, 06-CR-800 (SLT), Dkt. No. 35. On December 21, 2006, the Honorable Sandra M. Townes reversed Judge Levy's order, concluding that the defendant was in fact a danger to the community, and entered a permanent order of detention against him. Id. Dkt No. 31.

In February 2007, the defendant was charged in a superseding indictment with racketeering and racketeering conspiracy, in connection with his membership in and association

with the Bonanno family. The charged predicate acts included the extortionate extension and collection of credit involving five separate victims, along with related substantive counts. In August 2008, the defendant was convicted, pursuant to a plea of guilty to a superseding information, of one count of racketeering, including predicate acts of extortionate collection of credit and illegal gambling. The defendant was sentenced to 32 months' imprisonment. He was released from federal custody on March 5, 2009, and is subject to a term of supervised release that is scheduled to terminate on March 4, 2012.

II. July 5, 2011 Arrest

Since the time of his release from prison in March 2009, the defendant has continued to use extortionate means to collect and attempt to collect debts that Virtuoso contends are owed to him and to others, including extortionate loans that he made prior to his incarceration. The crimes with which Virtuoso is now charged – extortionate collection of credit, in violation of 18 U.S.C. § 894(a), and the use of facilities in interstate commerce to commit larceny by extortion, in violation of 18 U.S.C. § 1952(a)(3)(A) and New York Penal Law § 155.30 – arise out of loansharking activity involving multiple victims over the last two years, following Virtuoso's release from prison and during the time he has been on supervised release.

The evidence against the defendant is strong, and includes court-authorized wiretaps in which Virtuoso can be heard personally demanding money from his victims, consensual recordings in which fellow members and associates of the Bonanno family discuss Virtuoso's status in the family, and proceeds and records of Virtuoso's loansharking activity that were seized from his place of business pursuant to a court-authorized search on Friday, July 1, 2011.

DISCUSSION

I. Legal Standard

A. Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of

dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

The Bail Reform Act makes clear that evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

B. Organized Crime Defendants

Courts in this circuit routinely have faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses. See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family members detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F.

Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Defede, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998) (Luchese family acting boss detained as danger to the community); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese family acting boss detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand for at least the following propositions: (1) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (2) elaborate bail packages involving home detention and electronic monitoring are often insufficient to protect the community from dangerous organized crime defendants.

1. Organized Crime Defendants Are Likely to Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to the community due to the continuing nature of the illegal enterprise and its violent criminal activities. Because organized crime defendants are career criminals who belong to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail. See Salerno, 631 F. Supp. at 1375 (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

Congress noted that defendants pose a danger to the community not only when they commit acts of violence, but when it is likely that they will commit even non-violent crimes that are detrimental to the community. See S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3195 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence"). In Salerno, the court held:

> In light of Congress' direction that "[w]here there is a strong probability that a person

> will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate" . . . .

631 F. Supp. at 1371 (quoting Senate Report at 3189). See also United States v. Colombo, 777 F.2d 96, 99 (2d Cir. 1985).

2. Elaborate Bail Packages Are Insufficient to Protect the Community Against Violent Organized Crime Defendants

The Second Circuit has repeatedly rejected "elaborate" bail packages for dangerous defendants, and has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals. See, e.g., United States v. Dono, Nos. 07-5333-cr(L), 07-5334-cr(CON), 275 Fed. Appx. 35, 2008 WL 1813237, at *2-3 (2d Cir. Apr. 23, 2008) (rejecting conditions that included, among others, home detention and electronic monitoring, and a requirement that the defendant's father – a retired police officer – take "personal responsibility" for the defendant); Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail package secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail package secured with real property, home detention, restricted visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting $500,000 bail package secured by real property). In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted). See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's

dim view of the effectiveness of home detention and electronic monitoring. See, e.g., United States v. Cantarella, 2002 WL 31946862, *3-4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

## II. The Defendant Poses a Danger to the Community

As noted above, Virtuoso is charged with extortionate collection of credit, in violation of 18 U.S.C. § 894(a), and the use of facilities in interstate commerce to commit larceny by extortion, in violation of 18 U.S.C. § 1952(a)(3)(A). Both are crimes of violence. See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another"). The evidence against Virtuoso is strong, and includes, inter alia, (1) the testimony of multiple victims and other witnesses, (2) consensual recordings in which members and associates of the Bonanno family discuss Virtuoso's role as an inducted member of the crime family, (3) court-authorized wiretaps in which Virtuoso can be heard actually committing the charged crimes and (4) proceeds and records of Virtuoso's loansharking activity that were seized from his place of business pursuant to a court-authorized search warrant just four days ago.

At trial, the government expects to present evidence in the form of witness testimony and court-authorized wiretaps that, following his release from prison in March 2009, Virtuoso resumed the loansharking activity for which he had previously been arrested and incarcerated, in many cases extorting the same victims over the same debts. For example, as set forth in the complaint, one individual, identified in the complaint as Debtor #1, advised the FBI that he obtained a $1,000 loan from the defendant approximately one year before Virtuoso was arrested in November 2006. Debtor #1 met with Virtuoso once or twice per

month, in the rear office area of the defendant's butcher shop, to make cash payments on the loan in the amount of $50 or $100. Those amounts appear to correspond to an extortionate interest rate of five percentage points, or more than 250 percent per year.[1] On one occasion, at the defendant's direction, Debtor #1 made the payment inside a walk-in freezer located in the rear of the butcher shop. Debtor #1 ceased making regular payments to the defendant at the time of Virtuoso's 2006 arrest and incarceration, but resumed making payments following Virtuoso's March 2009 release, after the defendant contacted Debtor #1 and stated that he continued to owe Virtuoso money. Debtor #1 continued making payments to Virtuoso until he was approached by agents of the FBI inquiring about the debt.

In addition, another individual advised the FBI that Debtor #1 met with Virtuoso privately in the rear office area of the butcher shop approximately twice per month for approximately one year prior to Virtuoso's 2006 arrest. This individual also advised the FBI that, following Virtuoso's 2009 release from prison, Virtuoso stated, in sum and substance, that he intended to resume making collections on loans that he had made prior to his incarceration.

The government also expects to introduce court-authorized wiretaps in which the defendant can be heard extorting multiple victims during the time he has been on supervised release. For example, Virtuoso made numerous calls to an individual identified in the complaint as Debtor #2, demanding payment of a debt. In a call on our about June 25, 2010, Virtuoso told Debtor #2: "Alright don't forget this week is going to be 3 bills. So we backing up again. See if we can catch up with them. Alright?" Virtuso went on to clarify that he was referring to "2 bills and plus this bill of Friday." On or about July 28, 2010 – after numerous calls in which Debtor #2 sought to

---

[1] As set forth in the complaint, after being issued a federal grand jury subpoena, Debtor #1 told a confidential source of the FBI ("CS") that he intended to meet with Virtuoso's attorney before testifying so that the attorney could prepare him for his testimony. Debtor #1 told the CS that he had told federal agents that the money he borrowed from Virtuoso was a personal loan, with no interest. In fact, the CS had previously learned from a Bonanno soldier acquainted with both Debtor #1 and Virtuoso that Debtor #1 paid Virtuoso a usurious interest rate on the loan, which the CS understood to be five percentage points per week on a principal amount of $1,500.

fend off Virtuoso's demands and stall for time – Virtuoso called Debtor #2's workplace and left the following message: "Tell him he's got to call me or I come over there."

Similarly, in a call on or about June 23, 2010, Virtuoso advised an individual identified in the complaint as Debtor #3 that Debtor #3 owed him $450 and stated: "I don't want to, you know, you got yourself in trouble here then what, what, then what are we gonna do? What are we playing games?" Virtuoso told Debtor #3 to "stop playing games. Get yourself together."

The government also expects to introduce evidence of loansharking proceeds and records that were seized from Virtuoso's butcher shop pursuant to a court-authorized search on Friday, July 1, 2011. The evidence includes more than $24,000 in cash and a ledger book setting forth information concerning several of Virtuoso's victims. Although several pages appear to have been torn from the book prior to the search, one of the remaining pages, captioned with the name of one of Virtuoso's victims, contains multiple entries labeled "groceries" and "cash," with amounts listed besides each. The page appears consistent with Virtuoso's practice, as described by one of his victims, of seperately recording the victim's grocery tab and the cash loans the victim obtained from Virtuoso.

Other records that were seized during the search include address books and Rolodexes containing contact information for several of Virtuoso's loanshark victims, along with contact information for other members and associates of organized crime. For example, a slip of paper within one Rolodex contains the handwritten entry "Capo Lucchese" and the names "Johnny Sideburns Cerello" and "Glenn the Wheel Guadagno." Both men are known to law enforcement to be associated with the Lucchese organized crime family of La Cosa Nostra, and John Cerrella, also known as "Johnny Sideburns," is known to be a captain in that family. In June 2003, Cerrella was convicted, pursuant to a plea of guilty in the United States District Court for the Eastern District of New York, of racketeering and witness tampering, and sentenced to 96 months in prison. In June 2008, Guadagno was convicted, pursuant to a plea of guilty in the United States District Court for the Eastern District of New, of extortion conspiracy.

Virtuoso also maintained a thick file of newspaper clippings concerning the trials of various mob members and associates, including articles documenting the conviction of Bonanno family Acting Boss Vincent Basciano, the 2009 deportation of Bonanno family Acting Boss Sal "the Iron Worker" Montagna, the

2009 arrest of Bonanno family members and associates for a violent stabbing, and various articles related to the testimony of cooperating witnesses at the 2009 trial of Genovese captain Michael Coppola.

These facts make clear that Virtuoso is a danger to the community who will not cease his criminal activity if released on bail. Virtuoso's resumption of loansharking activity immediately following his release from prison and while under court supervision demonstrates his flagrant lack of regard for the authority of the court. Indeed, Magistrate Judge Levy recently rejected the offer of a substantial bail package made by a member of the Gambino crime family on precisely this ground. In March 2008, Vincent Gotti, a Gambino soldier charged with RICO conspiracy, proposed a $10 million bail package. Though the package Gotti proposed was secured by over $5 million in real property and included conditions such as home detention and electronic monitoring, Judge Levy found it insufficient in light of the evidence the government proffered that Gotti had been under some form of court supervision at the same time he was engaging in narcotics dealing and loansharking:

> [T]he key factors are what the Government has proffered happened during the time that Mr. Gotti was either on parole or in prison or under indictment in the past[,] and that gives me serious concern because it has to do with whether or not an order of the Court can be evaded.

<u>United States v. Gotti</u>, Cr. No. 08-76, Hearing Transcript, Docket Entry No. 440 at 34 (E.D.N.Y. Mar. 13, 2008). Gotti appealed Magistrate Judge Levy's decision, offering to improve the bail package by agreeing to "a Consensual Wire Tap on all phones in the home [and] any other reasonable condition imposed." <u>Id</u>., Docket Entry No. 443 at 1. After hearing oral argument, the Honorable Jack B. Weinstein, United States District Judge, affirmed Magistrate Judge Levy's decision. <u>See</u> <u>id</u>., Docket Entry No. 582. <u>Gotti</u> clearly counsels in favor of detention here.

The particular nature of Virtuoso's crimes further underscores the need for detention in this case. Virtuoso's threats to his victims – including, as noted, his prior threat to kill a victim who did not pay him and, more recently, his ominous warning that one victim should "call me or I come over there" – demonstrates that no condition or combination of conditions can assure the safety of the community should he be released. Moreover, as an inducted member of the Bonanno crime family with

demonstrated ties to high-ranking members of other crime families, Virtuoso has members and associates of organized crime at his disposal to intimidate witnesses or commit violence on his behalf.[2] Finally, the large quantity of cash seized from Virtuoso's desk – which far exceeds any amount that might reasonably be expected to be stored in a legitimate neighborhood butcher shop – demonstrates the lucrative nature of Virtuoso's criminal activities. That cash also demonstrates that Virtuoso – a convicted felon who faces a lengthy term of incarceration and has strong ties to his native Italy – has the resources to flee if given the opportunity.

Accordingly, all of the relevant factors favor pretrial detention in this case. See 18 U.S.C. § 3142(g). First, the crimes of violence with which Virtuoso is charged are serious, could result in a lengthy prison sentence, and were committed while he was on supervised release. Second, Virtuoso's lengthy criminal history and his membership in the Bonanno crime family, and the fact that he has members and associates of that crime family and other organized crime families available to him to commit acts of violence on his behalf, all militate in favor of detention. Third, Virtuoso poses a danger to the community through his intimidation of victims and witnesses and his demonstrated refusal to comply with court orders by committing new crimes of violence while under court supervision. Fourth, the evidence of Virtuoso's guilt is strong.

III. The Defendant Is A Risk of Flight

The defendant also poses a risk of flight. If convicted, Virtuoso faces a sentence of up to 20 years in prison for the violation of 18 U.S.C. § 894(a); up to five years in prison for the violation of 18 U.S.C. § 1952(a)(3)(A); and an additional two years in prison for violating the conditions of his supervised release by committing the charged crimes while on supervised release. The significant sentence faced by the defendant gives him a substantial incentive to flee. See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

---

[2] The fact that, as set forth above, one of Virtuoso's victims may have already met with Virtuoso's counsel to prepare his grand jury testimony highlights the risk that Virtuoso will seek, directly and indirectly, to influence the testimony of witnesses against him.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the court issue a permanent order of detention pending trial.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: /s/
Stephen E. Frank
Assistant U.S. Attorney
(718) 254-6143

cc: Defense counsel (upon notice of appearance)
Clerk of Court (by ECF)