JM:SEF
F.#2010R00578

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                11-CR-508 (SLT)

MICHAEL VIRTUOSO,
    also known as
    "Mike the Butcher,"

       Defendant.

- - - - - - - - - - - - - - - - X


### THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE ON BAIL PENDING TRIAL


                                        LORETTA E. LYNCH
                                         United States Attorney
                                         Eastern District of New York

STEPHEN E. FRANK
Assistant U.S. Attorney
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.   The Defendant's Membership in the
        Bonanno Crime Family . . . . . . . . . . . . . . 2

    II.  The Defendant's Prior Detention
        Proceedings and Conviction . . . . . . . . . . . 9

    III. The Defendant's Multiple Violations of
        Supervised Release . . . . . . . . . . . . . . 13

    IV.  The July 5 Arrest and Current Indictment . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 24

    I.   Applicable Law . . . . . . . . . . . . . . . . 24

    II.  Analysis . . . . . . . . . . . . . . . . . . . 25

        A.   The Applicable Factors Favor Detention . . . 26

        B.   The Defendant's Remaining Contentions
            Do Not Counsel in Favor of Release . . . . . . 34

        C.   The Defendant's Motion Should be
            Removed From ECF . . . . . . . . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 39

i

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in opposition to the defendant's motion for release on bail pending trial.  The defendant – a convicted loanshark and member of the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family") – now seeks to be released on the basis of his contention that, <u>inter alia</u>, his "alleged affiliation with organized crime" and the "unsupported and conclusory" charges against him do not warrant detention.  This Court has previously found the defendant to be a danger to the community for purposes of bail.  Remarkably, the defendant <u>concedes</u> in his motion that, even while on supervised release, he has continued to make loans and to collect debts on behalf of others – the very same conduct for which he was previously convicted.  Moreover, the defendant's analysis improperly places the burden of proof on the government, contrary to clear law that requires, in the context of a violation of the conditions of supervised relief, that <u>the defendant</u> prove, by clear and convincing evidence, that he does not represent a danger to the community or a risk of flight.  The defendant fails to meet that burden here, where, to the contrary, the evidence that he represents a danger to the community is clear and convincing.  Accordingly, for the reasons set forth below, as well as in the government's letter to the Court dated July 5, 2011, the defendant's motion should be denied.

1

BACKGROUND

I.    The Defendant's Membership in the Bonanno Crime Family

The defendant has been an inducted member of the Bonanno family for close to a decade.  The evidence of his membership in this violent criminal enterprise is strong, and consists of: (1) cooperating witness testimony, (2) consensual recordings, (3) the defendant's own sworn statements to this Court, (4) documents seized from the defendant's butcher shop pursuant to a court-authorized search on or about July 1, 2011, and (5) telephone calls intercepted by the government pursuant to a court-authorized wiretap that demonstrate his continued association with members and associates of the Bonanno family, in violation of the conditions of his supervised release.

For example, in the 2006 federal racketeering trial of former Bonanno boss Vincent Basciano, a cooperating witness for the government testified that, in the months prior to Basciano's 2004 arrest, the witness secretly delivered a message from Basciano to Joseph Massino – the then-boss of the Bonanno family who was incarcerated – that Basciano had inducted "Mike the Butcher or Baker" into the criminal enterprise.  See United States v. Basciano, Cr. No. 03-929 (NGG), trial transcript at 6800, attached hereto as Exhibit A.

2

More recently, in Basciano's 2011 trial for murder in-aid-of racketeering, the government introduced consensual recordings of Basciano discussing Virtuoso's induction into the Bonanno family with Massino. In those conversations, Massino indicated that he had initially rejected a proposal by Bonanno captain Joseph Cammarano, Sr., also known as "Joe Saunders" and "Joe C.," to induct Virtuoso into the family, based on Massino's concerns over Virtuoso's drug use. The following is an excerpt from a transcript of those recordings:

> MASSINO: I'm gonna give you a perfect example. Alright, listen to me, Joe Saunders puts in this kid, Mike . . . the butcher.
>
> BASCIANO: Yeah.
>
> MASSINO: I didn't know you then. Maybe six, seven years ago. The guy comes he said chief . . . I grab Joe Saunders, (UI), never in a million I said Joe why don't you listen to me I got it from a good information. This guy uses coke. No. No. No. Listen, what I fuckin' tell you. Don't be so fuckin' stubborn. Go and find out. He goes he asks the kid what you think the kid tells him?
>
> BASCIANO: Just on the weekend.

See Excerpt from 1/3/05 recording, attached hereto as Exhibit B-1. Basciano then explained to Massino, in a conversation four

3

days later, that he had inducted Virtuoso into the crime family while Massino was in prison, and assigned Virtuoso to Cammarano's crew:

> MASSINO:   I think you's made sixteen guys
>            since I'm in jail.
>
> BASCIANO:  Well, I'm . . .
>
> MASSINO:   You's made nine, I think they made
>            six or seven.
>
> BASCIANO:  What's happens is I told . . .
>
> MASSINO:   Am I right? Who's ya's make?
>
> BASCIANO:  . . . I, I made the money. Who, who
>            we make? I gave uh, Joe C, Anthony
>            Pipitone and that uh, uh, Mike.
>
> MASSINO:   Oh, Anthony Pipitone to Joe C?
>
> BASCIANO:  Yeah, gave him to Joe C.
>
> MASSINO:   Does he know anybody there?
>
> BASCIANO:  Yeah! He knew people there.
>
> MASSINO:   Okay, alright, I'm shocked.
>
> BASCIANO:  And, and, and, and Mike the Butcher
>            went to Joe C.
>
> MASSINO:   Oh, Mike the Butcher, he belongs
>            there.

See Excerpt from 1/7/05 recording, attached hereto as Exhibit B-2.

In 2008, the defendant acknowledged his membership in the Bonanno family, under oath, as part of his plea of guilt, before this Court, to a superseding information charging him with

4

conducting the affairs of that enterprise through a pattern of racketeering, including predicate acts of extortionate collection of credit and illegal gambling.  See 8/29/07 hearing transcript, United States v. Virtuoso, 06-CR-800 (SLT) (EDNY), at 25-26, attached hereto as Exhibit C.

The defendant's involvement with the affairs of the Bonanno family has continued since his release from prison after serving a sentence of 32 months on those racketeering charges, and while serving a term of supervised release imposed by this Court.  During the past 15 months, while investigating the instant extortion charges, government agents intercepted calls pursuant to a court-authorized wiretap in which the defendant spoke with, arranged meetings with, and passed messages to, other members and associates of the Bonanno family.  For example, in a call intercepted on or about August 1, 2010, the defendant spoke with Vito Badamo, a convicted felon and inducted member of the Bonanno crime family.[1]  The following is an excerpt from that call:

---

[1] In August 1995, Badamo was convicted, pursuant to a plea of guilty in the United States District Court for the District of Rhode Island, of possession with intent to distribute cocaine and using and carrying a firearm during and in relation to a drug trafficking offense, and sentenced to 123 months in prison.  As noted in the government's Title III application, Badamo at one time reported to Anthony Pipitone, also known as "Little Anthony," a convicted felon and acting captain in the Bonanno family.  Notably, the defendant's Rolodex also contained an entry marked "Little Anthony."  See Exhibit D, attached hereto.

5

```
BADAMO:    Hello?

VIRTUOSO:  Vito!

BADAMO:    Who's this?  My man!  What time you
           ready?

VIRTUOSO:  Uh, listen to me, I just got a call
           from my sister saying my mother
           doesn't feel good.

BADAMO:    All right, don't worry about it.
           We'll go take care of it alone.

VIRTUOSO:  I have to brother.

BADAMO:    Please, I love you pal.  Be safe
           and I'll talk to you soon.  (UI)

VIRTUOSO:  We'll talk later, ciao.
```

See 8/1/10 Call, attached hereto as Exhibit B-3.[2]

In a call intercepted three days later, an individual who identified himself as "Paul" advised the defendant that he had passed a message from the defendant to Vincent Faraci, also known as "Vinny Green" and "Vinny Vegas," a convicted felon and inducted member of the Bonanno family who, like the defendant, was on supervised release at the time, and who had recently relocated to the New York area from Las Vegas:[3]

---

[2]    This excerpt, and the excerpts of calls cited below, are based on draft transcripts and draft translations.

[3]    Faraci was convicted in the United States District Court for the District of Nevada in November 1985 of conspiracy to defraud the United States.  Faraci was also convicted in the United States District Court for the District of Nevada in March 2008 of conspiracy to defraud the United States.

6

```
Paul:      Yes, Michael, how are you, buddy?
           It's Paul.

VIRTUOSO: Hey, Paul.  How are you, pal?

Paul:      OK.  I just wanted to let you know
           -- I know you don't like to talk
           too much on the phone -- but I
           spoke with, uhh, Mr. Vinny
           Vegas. . .

VIRTUOSO: Excellent.

Paul:      . . . and I told him, I gave this
           number, I told him to have whoever
           he's got, then, uh, give you a
           buzz.

VIRTUOSO: Good.  Good.

Paul:      OK?

VIRTUOSO: Take care, pal.

Paul:      Thank you, buddy.  Bye.
```

See 8/4/10 Call, attached hereto as Exhibit B-4.  Three days
after that, the defendant placed a call to the wife of Paul
Spina, a Bonanno soldier, who was incarcerated pending trial on
assault in-aid-of racketeering and related charges.  See 8/7/10
Call, attached hereto as Exhibit B-5.  In the call, Virtuoso
inquired whether Spina had received a plea offer from the
government and indicated, in referenced to Spina's co-defendants,
that he had "heard the other people took something."  Id.
Virtuoso then requested that Spina's wife "come over here" so
that they could "catch up on a few things," adding: "Understand,
you know what I'm saying.  Please."  Id.  Virtuoso concluded the

7

call by asking Spina's wife to "[g]ive him my love please."  Id.
Spina's wife responded: "I'm going to see him on Thursday and
I'll let him know."  Id.[4]

        On July 1, 2011, agents executing a court-authorized
search warrant of Virtuoso's butcher shop seized documents and
contact information relating to still other members and
associates of organized crime.  For example, a slip of paper
within one Rolodex contained the handwritten entry "Capo
Lucchese" and the names "Johnny Sideburns Cerello" and "Glenn the
Wheel Guadagno."  See Exhibit E, attached hereto.  Both men are
convicted felons associated with the Lucchese organized crime
family, and John Cerrella, also known as "Johnny Sideburns," is a
captain in that family.[5]  Other individuals associated with the
Bonanno family whose contact information was found in the
defendant's files include, inter alia, Vincent Guardino[6] and Vito

---

        [4]     In 2011, Spina was convicted, pursuant to a plea of
guilty before the Honorable Nicholas G. Garaufis, of two counts
of assault in-aid-of racketeering.  In 2008, Spina was convicted,
pursuant to a plea of guilty before this Court, of conspiracy to
commit murder in-aid-of racketeering.  Spina and Virtuoso were
co-defendants in the 2008 case.

        [5]     In June 2003, Cerrella was convicted, pursuant to a
plea of guilty in the United States District Court for the
Eastern District of New York, of racketeering and witness
tampering.  In June 2008, Guadagno was convicted, pursuant to a
plea of guilty in the United States District Court for the
Eastern District of New York, of extortion conspiracy.

        [6]     The defendant contends, in his brief, that the
government "blindly guessed" that Guardino's telephone number,
which appeared in toll records cited in the government's Title

8

Pipitone, both convicted felons.[7]  <u>See</u> Exhibit F, attached
hereto.  The agents also seized a thick file of newspaper
clippings concerning the trials of various mob members and
associates, including articles documenting the conviction of
Basciano, the 2009 deportation of Bonanno family Acting Boss Sal
"the Iron Worker" Montagna, the 2009 arrest of Bonanno family
members and associates for a violent stabbing, and various
articles related to the testimony of cooperating witnesses at the
2009 trial of Genovese captain Michael Coppola.

II.   <u>The Defendant's Prior Detention Proceedings and Conviction</u>

As set forth in the government's letter of July 5,
2011, the defendant was previously arrested by agents of the
Federal Bureau of Investigation ("FBI") on November 9, 2006, and
charged with conspiracy to commit extortionate collection of

---

III application, belonged to Guardino.  (Def. Br. at 24).  In the
defendant's address book, however, the number was listed
alongside the name "Vinny Guardino," and directly below an entry
for "Vito Adamo" that listed the number for Vito Badamo,
referenced above.

[7]     In August 1993, Guardino was convicted, pursuant to a
plea of guilty, in Nassau County Court, of attempted grand
larceny, and sentenced to a one-year term of imprisonment. In
July 2000, Guardino was convicted, pursuant to a plea of guilty,
in the United States District Court for the Eastern District of
New York, of Hobbs Act robbery, and sentenced to 46 months'
imprisonment.  In November 2010, Vito Pipitone was convicted,
pursuant to a plea of guilty, in the United States District Court
for the Eastern District of New York, of two counts of assault
in-aid-of racketeering, and sentenced to 41 months' imprisonment.
Vito Pipitone is the brother of Anthony Pipitone, referenced
above.

credit.  Following an arraignment, the Honorable Roanne L. Mann,
United States Magistrate Judge for the Eastern District of New
York, rejected the defendant's proposed bail package of $1.7
million, secured by multiple properties and three suretors, and
entered a permanent order of detention on the basis that the
defendant represented a danger to the community.  See United
States v. Virtuoso, 06-CR-800 (SLT), Dkt. No. 15.  In so doing,
Judge Mann found that the government had "established by clear
and convincing evidence that the defendant participated in
communicating threats to a loanshark victim and in attempting to
locate her to carry out those threats."  Id.

On December 6, 2006, Virtuoso and two co-conspirators
were indicted by a grand jury in the Eastern District of New York
on three counts of extortionate extension of credit, extortionate
collection of credit, and extortionate collection of credit
conspiracy.  At the defendant's arraignment on the indictment on
December 19, 2006, the Honorable Robert M. Levy granted his
revised proposed bail package of up to $5 million, secured by 12
properties, but stayed the order pending the government's appeal.
See United States v. Virtuoso, 06-CR-800 (SLT), Dkt. No. 25.  On
December 21, 2006, this Court reversed Judge Levy's order and
entered a permanent order of detention.  Id. Dkt No. 31.  In
rejecting the proposed bail package – which included all of the
properties the defendant now proposes to post, as well as four

10

additional properties – the Court concluded that the government
had proved, by clear and convincing evidence, that the defendant
was a made member of the Bonanno crime family, that he was a
danger to the community, and that pursuant to 18 U.S.C.
§ 3142(e)(1), there was no condition or combination of conditions
that could reasonably assure the safety of any other person and
the community.  See United States v. Virtuoso, 06-CR-800 (SLT),
Dkt. No. 119, at 18-22.[8]  The Court relied, in part, on a
consensual recording, made by a cooperating witness for the
government, in which one of the defendant's co-conspirators
repeatedly warned the witness that a debtor would be killed – and
made other, implicit threats of harm against the debtor's
children – if the debt was not repaid, stating:

> Listen, either they're gettin' paid or she's
> going in the trunk of a car. Right now she's
> going in the trunk of a car.

10/19/06 Recording, attached hereto as Exhibit B-6.

In February 2007, the defendant was charged in a
superseding indictment with racketeering and racketeering
conspiracy, in connection with his membership in and association
with the Bonanno family.  The charged predicates included
extortionate extensions and collections of credit involving five

---

[8]    Having reached that conclusion, the Court concluded
that it need not reach the question whether the defendant also
represented a risk of flight.  United States v. Virtuoso, 06-CR-
800 (SLT), Dkt. No. 119, at 18.

11

separate victims, along with related substantive counts.  In
August 2008, the defendant was convicted, pursuant to a plea of
guilty, to a superseding information charging one count of
racketeering.  As part of his allocution, the defendant
acknowledged his membership in the Bonanno crime family and
acknowledged committing the charged predicate acts of
extortionate collection of credit from one victim, and illegal
gambling.  See United States v. Virtuoso, 06-CR-800 (SLT), Dkt.
No. 269, at 26.  The defendant admitted, with respect to the
extortion count, that he "participate[d] in collecting money"
from an individual to whom money had been loaned at a "high rate
of interest," and stated:  "Although I did not threaten him, it
was understood that a threat of harm would be used if he did not
pay."  Id.

        The defendant was sentenced to 32 months' imprisonment.
He was released from federal custody on March 5, 2009, and is
subject to a term of supervised release that is scheduled to
terminate on March 4, 2012.  The terms of the defendant's
supervised release provide, inter alia, that he "shall not
associate with any person convicted of a felony, unless granted
permission to do so by the probation officer," and that he "shall
not associate, in person, through mail, electronic mail, or
telephone with any individual with an affiliation to any

organized crime groups, gangs, or any other criminal enterprise." Id., Dkt. 442, at 3-4.

III. <u>The Defendant's Multiple Violations of Supervised Release</u>

Since the time of his release from prison, the defendant has violated the conditions of his supervised release in multiple ways, including: (1) committing new crimes, including but not limited to the extortions with which he is now charged, as set forth in Section IV below; (2) associating with and passing messages to members and associates of organized crime, as set forth above in Section I above; and (3) associating with other convicted felons.

For example, the defendant repeatedly spoke by telephone and met with an individual, Angelo Speciale, who was convicted in Italy, in 2004, of group sexual assault, and in 2006, of armed robbery, both felonies. On or about June 29, 2010, FBI agents monitoring the telephone in Virtuoso's butcher shop pursuant to the court-authorized wiretap intercepted a call from Speciale during which Virtuoso, speaking in the Neapolitan dialect of Italian, advised Speciale not to speak at length on the telephone, and Speciale, responding in Italian, made arrangements to meet Virtuoso in person. Virtuoso told Speciale: "Thank you for the call, but I'm telling you, let's not talk

13

about these things.  When you come here, then we'll talk about them.  Understand?  Don't worry Angelo, as long as you let me know what you're doing.  This is important."

Thereafter, Speciale called Virtuoso on or about July 28, 2010.  The following is an excerpt of a portion of the conversation, which was conducted in Italian:

| | |
|---|---|
| VIRTUOSO: | What about you?  What do you have to tell me? |
| SPECIALE: | Eh, I'm here... working.  Always. |
| VIRTUOSO: | You're working? |
| SPECIALE: | Eh. |
| VIRTUOSO: | Ah.  Sometimes.  I don't want to work either.  You know? |
| SPECIALE: | [Laughs] |
| VIRTUOSO: | I'm getting annoyed. |
| SPECIALE: | [Laughs] |
| VIRTUOSO: | I'm telling you the truth.  I'm, I'm ... getting annoyed -- not getting annoyed, I am annoyed. |
| SPECIALE: | Eh. |
| VIRTUOSO: | Sometimes I tell myself, "Miche', let's do what we used to do before."  But ... |
| SPECIALE: | Ayy! |
| VIRTUOSO: | ... I stop, I stop, we stop ourselves. |
| SPECIALE: | That can't happen. |
| VIRTUOSO: | That can't happen for now.  [Laughs] |

14

| | |
|---|---|
| SPECIALE: | As soon as, as soon as the song ends, [UI] |
| VIRTUOSO: | A little while longer. |
| SPECIALE: | Eh, that's it. |
| VIRTUOSO: | A little while longer, a little while longer. |

Agents executing the court-authorized search warrant of Virtuoso's butcher shop on or about July 1, 2011, found entries for telephone numbers for Speciale in Virtuoso's Rolodex and his address book.  See Exhibit G, attached hereto.

IV.  The July 5 Arrest and Current Indictment

On July 5, 2011, the defendant was arrested on a complaint charging him with extortionate collection of credit, in violation of 18 U.S.C. § 894(a), and the use of facilities in interstate commerce to commit larceny by extortion, in violation of 18 U.S.C. § 1952(a)(3)(A) and New York Penal Law § 155.30.  On July 13, 2011, the defendant was indicted by a grand jury in the Eastern District of New York on two counts of extortionate collection of credit, in violation of 18 U.S.C. §§ 894(a)(1) and 2.  The defendant has also been indicted in the Southern District of New York on a charge of conspiring to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 812, 841(b)(1)(A) and 846.

The extortion charges arise out of loansharking activity over the last two years, following Virtuoso's release

15

from prison and during the time he has been on supervised release. The defendant is currently charged with the extortion of two victims, identified in the indictment as John Doe #1 and John Doe #2.

The evidence of the charged crimes is strong and includes: (1) information provided by multiple victims and other witnesses concerning the charged extortions as well as other recent and historical loansharking activity by the defendant; (2) consensual recordings in which members and associates of the Bonanno family discuss Virtuoso's loansharking activity and his role as an inducted member of the crime family; (3) court-authorized wiretaps; (4) proceeds and records of Virtuoso's loansharking activity that were seized from his place of business; and (5) phone records and other documentary evidence establishing the relationship between the defendant and his extortion victims.

For example, an individual who is acquainted with the defendant has informed the government that, following the defendant's release from prison, the defendant made statements admitting that he intended to resume making collections on loanshark loans that he had made prior to his incarceration. Other witnesses have informed the government that the defendant did exactly that with respect to John Doe #1 and John Doe #2. For example, as set forth in the complaint, John Doe #1 has

16

informed the government, <u>inter alia</u>, that: (1) he obtained a $1,000 loan from the defendant, whom he did not previously know, but whom he knew to be involved in organized crime, approximately one year before the defendant's 2006 arrest; (2) he did not believe the loan to be enforceable by civil judicial process; (3) he made regular cash payments of $50 or $100 to the defendant, in the rear office area of the defendant's butcher shop, either once or twice per month; (4) on one occasion, the defendant directed him to make the payment inside a walk-in freezer located in the rear of the butcher shop; (5) he ceased making regular payments to the defendant at the time of the defendant's 2006 arrest; (6) following the defendant's release from prison in 2009, the defendant contacted him and stated that he continued to owe the defendant money; (7) thereafter, John Doe #1 resumed making payments of $50 or $100 to the defendant, once or twice per month, until December 2010, when he was interviewed by FBI agents.

Other witnesses have confirmed that Virtuoso met privately with John Doe #1 in the rear office area of the butcher shop approximately twice per month for approximately one year prior to Virtuoso's 2006 arrest, and that there is a walk-in freezer in that area, adjacent to Virtuoso's desk.  In addition, documentary evidence, including Virtuoso's address book and toll

17

records, establishes the relationship between the defendant and John Doe #1.

Similarly, John Doe #2[9] has informed the government, inter alia, that: (1) the defendant has a reputation in the community as a loanshark and "not somebody to mess with"; (2) following the defendant's release from prison, the defendant directed John Doe #2 to accompany him to the rear office area of the defendant's butcher shop where the defendant advised John Doe #2 that a debt incurred by another individual had not been paid and indicated that John Doe #2 was responsible for the debt and should pay it "to avoid the aggravation"; and (3) John Doe #2 promised on that occasion, and on subsequent occasions, to make payments on the debt because, among other things, he feared the defendant might kill him.  Other evidence, including, inter alia, wiretap recordings, other witnesses, and documents seized from the defendant corroborate the relationships between the defendant, the individual who incurred the debt, and John Doe #2.

In addition to the evidence of the charged extortions proffered above, the government is in possession of substantial additional evidence concerning the extent of the defendant's loansharking activities both prior to his 2006 arrest and following his 2008 release from prison, including information

---

[9]     John Doe #2 has multiple criminal convictions, including convictions for criminal possession of stolen property and fraud.

provided by cooperating witnesses concerning other usurious loans, and wiretap intercepts in which the defendant repeatedly requested the repayment of debts, or made arrangements to collect money, that he contended was owed to him or to others by various individuals.

For example, Virtuoso made numerous calls to an individual identified in the complaint as Debtor #2, demanding payment of a debt.[10]  In a call on our about June 25, 2010, Virtuoso and Debtor #2 had the following exchange:

DEBTOR #2:       Hi Mike.  How are you?  I'm sorry, I'll be there this morning.  As soon as my girl gets here I come down and see you.

VIRTUOSO:        Alright don't forget [UI] this week is going to be 3 bills. So we backing up again.  See if we can catch up with them. Alright?

DEBTOR #2:       No it would be 2 bills.  No?

VIRTUOSO:        Well, 2 bills and plus this bill of Friday.

---

[10]     The defendant concedes that he collected money from Debtor #2 that Debtor #2 purportedly owed to another individual who, in turn, owed money to the defendant.  (Def. Br. at 14-15). The defendant contends, however, that he never explicitly threatened Debtor #2, and that the debts owed by Debtor #2 to the third party, and by the third party to the defendant, were legitimate.  (Id. 17-18).  As set forth below, even assuming, arquendo, that these contentions are true, they are irrelevant to the question of the defendant's guilt.

19

DEBTOR #2:      Oh alright.  Alright.

VIRTUOSO:       [UI] 3 bills.

See 6/25/10 Call, attached hereto as Exhibit B-7.  On or about

July 5, 2010, the defendant called Debtor #2 again.  The

following is an excerpt from the conversation:

DEBTOR #2:      Um, let me come down there,
                to, let me see what I end up
                with today.  I wanna give you
                something.  Also I want to
                compare my paper with you.  I
                think you're missing a hundred
                dollar payment on your paper
                when I saw it last time.

VIRTUOSO:       We have to check that out
                goomba.

See 7/5/10 Call, attached hereto as Exhibit B-8.  On July 25,

2010, Virtuoso called Debtor #2 again and had the following

exchange:

VIRTUOSO:       This is Michael.

DEBTOR #2:      Hi Mike, how are you?

VIRTUOSO:       I'm doing fine.

DEBTOR #2:      I'll try and see you later,
                I'm fucked here.  My staff
                didn't show up.  So let me see
                what I can do today, OK?

VIRTUOSO:       If you want I could pass by to
                you . . . .

DEBTOR #2:      I didn't even count money yet.
                I'm like crazy right now.  Let
                me try and call you back.

VIRTUOSO:       Goodbye.

See 7/25/10 Call, attached hereto as Exhibit B-9.  On July 28, 2010, the defendant called Debtor #2's workplace.  Informed that Debtor #2 was not there, the defendant left the following message:  "Tell him this is the bakery, Michael.  Tell him he's got to call me or I come over there."  See 7/28/10 Call, attached hereto as Exhibit B-10 (emphasis added).

Similarly, Virtuoso repeatedly demanded money from an individual identified in the complaint as Debtor #3.[11]  The following is an excerpt from a call on June 23, 2010:

> DEBTOR #3:      Hi Mike, it's me [Debtor #3].
>
> VIRTUOSO:       Hey [Debtor #3].
>
> DEBTOR #3:      Is it OK with you if I come in tomorrow and get a few things? I just need a couple of things.
>
> VIRTUOSO:       [Debtor #3], you have about 450 bucks here, [Debtor #3].
>
> DEBTOR #3:      I'm trying Mike, please.  I don't know what else to do.
>
> VIRTUOSO:       You got 450 dollars here girl.
>
> DEBTOR #3:      Yeah but that's separate from the cash that I owe you right?
>
> VIRTUOSO:       Yeah, with the 40 and the 50, you owe 90 dollars in cash, you owe 440.  How you gonna take care of this mess?

---

[11]      The defendant concedes that he loaned money to Debtor #3, but contends that the loan was legitimate.  (Def. Br. at 18). As set forth below, the defendant's contention, even if true, is irrelevant, as a matter of law, to his guilt.

21

```
DEBTOR #3:      That's all together right?

VIRTUOSO:       All together, yeah.

DEBTOR #3:      I'm gonna give you your money,
                and give you some on the, you
                know the bill and then finish
                paying it the next check.

VIRTUOSO:       You know honey, I love you,
                I'll do whatever I gotta do,
                but I don't want to, you know,
                you got yourself in trouble
                here then what, what, then
                what are we gonna do?  What
                are we playing games?

DEBTOR #3:      No, we're not.

VIRTUOSO:       Then let's stop playing games.
                Get yourself together.

DEBTOR #3:      I am trying.  I'm trying.

VIRTUOSO:       Alright, keep on trying a
                little harder.
```

See 6/23/10 Call, attached hereto as Exhibit B-11 (emphasis
added).

        In a call with still another individual, the defendant
demanded to know "what happened man?"  The individual responded:
"I'll give you a call probably the 2nd of the month when I get my
check.  I've been sick that's why I haven't been calling.  I
can't even walk."  The defendant responded: "Is that what it is?"
See 7/26/10 Call, attached hereto as Exhibit B-12.

        Documents seized from the defendant's butcher shop in
July 2011 further corroborate the ongoing nature of the

defendant's illegal activity, including a ledger book and other papers in which Virtuoso recorded the debts and payments of his victims.  For example, although several pages appear to have been torn from the ledger book prior to the search, as noted in the government's July 5 letter, one of the remaining pages is captioned with the name of one of Virtuoso's victims and contains multiple entries labeled "groceries" and "cash," with amounts listed besides each.  <u>See</u> Exhibit H, attached hereto.  The page appears consistent with Virtuoso's practice, as described by one of his victims, of separately recording the victim's grocery tab and the cash loans the victim obtained from Virtuoso.  In addition, as previously noted, the government seized more than $24,000 in cash from the vicinity of the defendant's desk in the rear office area of the butcher shop.

ARGUMENT

I.   Applicable Law

        The Bail Reform Act empowers federal courts to order a defendant's detention pending trial where the government proves by clear and convincing evidence that the defendant is a danger to the community or, by a preponderance of the evidence, that he represents a risk of flight.  See 18 U.S.C. § 3142(e); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).  However, where, as here, a defendant is charged with violating a condition of supervised release, Fed. R. Crim. P. 32.1(a)(6) provides that "the burden of establishing by clear and convincing evidence that the person will not flee or pose a danger to the community rests with the person."  See also United States v. Porter, No. 03-CR-0129 (CPS), 2007 WL 3232502, *5-6 (ordering detention where defendant charged with violating conditions of supervised release failed to prove by clear and convincing evidence that he did not represent a danger to the community) United States v. Blair, No. 06-CR-208A, 2009 WL 3672064, *1 (W.D.N.Y. 2009) ("The defendant bears the burden of proving that he does not pose a risk of flight or a danger to the community.").[12]

---

        [12]   The government's July 5 letter relied on the more stringent standard under the Bail Reform Act, but failed to note that the burden of proof shifts to the defendant where the defendant is charged with violating the conditions of supervised release.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).  Evidentiary rules concerning admissibility do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also Fed. R. Evid. 1101(d)(3); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

## II.   Analysis

As set forth below, the defendant has utterly failed to meet his burden of proving by clear and convincing evidence that he does not represent a danger to the community or a risk of flight.  To the contrary, his admission that, even while on supervised release, he continued to lend money and collect debts – the precise conduct for which he was convicted and incarcerated – underscores the need for detention in this case.

At the same time, the evidence proffered by the government proves, even by the more stringent standard applicable in the absence of violations of supervised release, that the defendant represents both a danger to the community and a risk of

25

flight.  Indeed, the defendant's arguments – including, for
example, his contentions that Debtor #2 and Debtor #3, neither of
whom is the subject of a charged count, were not extorted, and
that the evidence concerning Debtor #1 is based on hearsay – are
both factually incorrect and legally irrelevant.  Accordingly,
the defendant's motion should be denied.

     A.   <u>The Applicable Factors Favor Detention</u>

     All four applicable factors favor detention in this
case.

     <u>First</u>, the nature and circumstances of the crimes
charged are serious and demonstrate the defendant's lack of
regard for legal authority.  The defendant is charged with two
counts of extortionate collection of credit, in violation of 18
U.S.C. § 894(a).  That crime is, by definition, a crime of
violence, <u>see</u> 18 U.S.C. § 3156(a)(4)(A), and the defendant, if
convicted, faces up to 20 years' imprisonment on each charge, in
addition to up to two years' incarceration for violating the
conditions of his supervised release.[13]  Moreover, as noted, both
crimes were committed following the defendant's previous
conviction for racketeering, including a predicate act of

_____

    [13]   The significant sentence faced by the defendant gives
him a substantial incentive to flee.  <u>See</u> <u>United States v. Dodge</u>,
846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a
"severe sentence" heightens the risk of flight).  The defendant
maintains ties to his native Italy and, as a member of organized
crime, has resources at his disposal to help him evade law
enforcement should he choose to do so.

loansharking.  The fact that, immediately upon his release from prison, and while under Court supervision, the defendant resumed the very conduct for which he was previously convicted, demonstrates his brazen defiance for Court orders.  This conclusion is further supported by the other violations of supervised release in which the defendant engaged, including, as noted, associating with convicted felons and passing messages to other members and associates of organized crime.  His conduct demonstrates that no condition or combination of conditions can assure the safety of the community should he be released.  See, e.g., United States v. Gotti, 08-CR-76 (JBW), Dkt. No. 440, at 34 (E.D.N.Y. Mar. 13, 2008) (rejecting proposed $10 million bail package, including home detention and electronic monitoring, citing proffered evidence that defendant was under court supervision when he engaged in charged narcotics dealing and loansharking).

Second, the history and characteristics of the defendant strongly favor detention.  The defendant has, as noted, been an inducted member of the Bonanno crime family – a violent criminal enterprise – for close to a decade.  In swearing allegiance to that family, he took an oath to put his crime family ahead of his own family, and to commit acts of violence,

including murder, when called upon to do so.[14]  He is a recidivist whose criminal record extends nearly three decades, to a 1983 conviction in Kings County Supreme Court for attempted criminal possession of a weapon in the third degree, and who, at his 2008 sentencing, failed to demonstrate any remorse for the harm he had caused his victims.  See United States v. Virtuoso, 06-CR-800 (SLT), 8/26/08 Sent. Tr. at 19, attached hereto as Exhibit I.  In addition, as noted, the defendant has been indicted in the Southern District of New York on a charge of conspiring to distribute and possess with intent to distribute one kilogram or more of heroin.  The defendant's butcher shop – which he describes as a "neighborhood fixture" where he has worked for over 30 years (Def. Br. at 12) – is also a front for his illegal activities where neighborhood residents have been extorted in the meat locker.

Third, the danger posed by the defendant's release is clear and present.  In a detention memorandum filed following the

---

[14]     The government does not contend, as the defendant suggests, that the fact of his membership in an organized crime family, without more, requires detention.  At the same time, as noted in the government's July 5 letter, organized crime defendants are career criminals who belong to an illegal enterprise, and who thus pose a distinct threat to commit additional crimes if released on bail – as the defendant's own conduct demonstrates.  See United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

defendant's 2006 arrest, the government argued that "Virtuoso currently manages and controls a lucrative loansharking operation – one that Virtuoso, if released from custody, is guaranteed to continue running, if for no other reason than to collect through extortionate means the payments due to him from his outstanding usurious loans." United States v. Virtuoso, 06-CR-800 (SLT), Dkt. 9, at 6.  Although the defendant was not released at that time, his actions following his release three years later demonstrate the accuracy of the government's prediction.  The defendant's victims are afraid of him.  One who testified before the grand jury as part of the instant investigation requested that government agents protect the victim's family.[15]  Moreover, as an inducted member of the Bonanno crime family with demonstrated ties to high-ranking members of that family and other crime families, Virtuoso has members and associates of organized crime at his disposal to intimidate witnesses or commit violence on his behalf.  Accordingly, the defendant's release creates twin dangers: one to the victims and witnesses who have provided or may yet provide evidence against him, and a second to the additional victims and the community that will be harmed by his continued criminality.

---

[15]    The defendant has gratuitously identified, by name, two of the victims described anonymously in the government's complaint.  For the reasons set forth below, the government respectfully requests that the Court order that filing withdrawn from ECF and refiled only after the names have been redacted.

29

Fourth, the evidence of the defendant's guilt is, as set forth above, strong. It consists of the defendant's own admissions, the testimony of numerous victims, witnesses and cooperating witnesses, consensual recordings, wiretap recordings, documents, and the cash proceeds of his illegal activities seized from the very location where witness after witness indicated he loaned them money.[16] Indeed, as noted, the defendant himself concedes that following his release from prison, he made loans and collected debts. With respect to Debtor #1 – who is identified in Count One of the indictment as John Doe #1 – the defendant concedes that the government's proffered evidence establishes two of the required elements of the charged crimes: (1) that he extended credit to John Doe #1, and (2) that he collected payments on that loan. (Def. Br. at 20).

What the defendant does not, because he cannot, concede, is the third element: that the defendant collected and attempted to collect payments from the John Doe #1 using extortionate means. Instead, the defendant contends that the

---

[16]    The defendant's contention that the more than $24,000 in seized cash represented the legitimate proceeds of his butcher business is absurd. Less than two years earlier, the defendant's attorney told the Court that the business was "on the verge of collapse." United States v. Virtuoso, 06-CR-800 (SLT), Sent. Tr. at 16. Moreover, the money was seized in the pre-opening hours of the Friday before a holiday weekend. It was found, not in the cash register, but in the vicinity of the defendant's desk at the back of the butcher shop, much of it hidden behind a clock on a bookshelf. More than two-thirds of the cash was in hundred dollar or fifty dollar bills.

government has not offered "first hand information" that the defendant "charged interest on the loan" or "threatened [John Doe #1] if payment was not made." (Def. Br. at 20). The defendant's contentions are factually wrong and, in any event, legally irrelevant.[17]

As an initial matter, in order to prove that the defendant used "extortionate means" to collect an extension of credit," the government need not prove that the defendant charged interest on the loan or explicitly threatened John Doe #1. Rather, extortionate means can include implicit threats of "violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7). In proving the existence of an implicit threat at trial, "evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means." Id. § 894(b). In addition, where there is evidence that

---

[17]    The defendant's contention that the government's proffer is based on hearsay is, as set forth below, untrue. It is also irrelevant, insofar as hearsay evidence is admissible at a detention hearing. See, e.g., 18 U.S.C. § 3142(f) ("rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information" at a detention hearing). See also United States v. Abuhamra, 389 F.3d 309, 321 (2d Cir. 2004) ("courts often base detention decisions on hearsay evidence").

31

the debtor understood the debt to be unenforceable, or that the loan was extended at a usurious rate, the government may, in the Court's discretion, prove the existence of an implicit threat through evidence of the defendant's reputation in the community. Id. § 894(c).

Here, the government has proffered evidence that satisfies all of these elements.  For example, the government has proffered evidence that John Doe #1 made regular cash payments of $50 or $100 to the defendant either once or twice per month, both prior to the defendant's incarceration and after the defendant's release.  On a $1,000 loan, those amounts correspond to a usurious interest rate of at least 60 percent per year and as much as 250 percent per year.[18]  See 18 U.S.C. § 892(b)(2).  The government has also proffered evidence that John Doe #1 understood that the loan was not enforceable by civil judicial process; that John Doe #1 understood the defendant to be involved in organized crime; that, in fact, John Doe #1 stopped making

---

[18]    As set forth in the complaint and the government's July 5 letter, after being issued a federal grand jury subpoena, John Doe #1 told a confidential source of the FBI ("CS") that he had told federal agents that the money he borrowed was a personal loan, with no interest – a fact the CS knew to be untrue from a Bonanno soldier acquainted with both John Doe #1 and the defendant.  Yet contrary to the defendant's contention, John Doe #1's statement to the CS does not suggest that John Doe #1 actually paid no interest on the loan.  Rather, it suggests that John Doe #1 wanted the CS to believe that he had misled federal agents in order to protect the defendant.  In fact, John Doe #1 did not tell the agents that the loan was a personal loan at no interest.

payments while the defendant was in prison for loansharking, but resumed making payments after his release; that the defendant directed John Doe #1 to make at least one payment in a walk-in freezer – a fact that the defendant himself concedes creates "an aura of fear" (Def. Br. at 20 n.12); and that the defendant had a reputation in the community as a loanshark who was involved in organized crime.  Accordingly, the proffered evidence overwhelmingly proves that the defendant used extortionate means to collect an extension of credit from John Doe #1.

Similarly, with respect to John Doe #2, the government has proffered evidence that the defendant attempted to collect a debt from John Doe #2 that John Doe #2 did not, himself, incur, in order "to avoid the aggravation"; that John Doe #2 knew the defendant to be a loanshark and "not somebody to mess with"; and that John Doe #2 promised to pay the debt because, among other things, he feared the defendant might kill him.

The overwhelming evidence of the defendant's other bad acts and prior extortions set forth above, which the government intends to offer at trial to prove, inter alia, the defendant's motive, intent and knowledge, also support a finding here that the evidence of the defendant's new crimes is very strong. Accordingly, all of the applicable factors counsel in favor of detention.

B.    The Defendant's Remaining Contentions
      Do Not Counsel in Favor of Release

      The defendant's remaining arguments for bail are
factually inaccurate, legally irrelevant, and do not meet his
burden of demonstrating by clear and convincing evidence that he
is not a danger to the community and a risk of flight.

      First, the defendant's contention that he did not
extort Debtor #2 or Debtor #3 is irrelevant, because the
defendant is not currently charged with extorting either
Debtor #2 or Debtor #3.  The defendant's contention is also
false.  The defendant concedes that he collected a debt from
Debtor #2 on behalf of another individual, and that he both
extended credit and collected payments from Debtor #3.  His
contention that those loans were legitimate is, as a legal
matter, beside the point.  See, e.g., United States v. Zappola,
523 F. Supp. 362, 366 (S.D.N.Y. 1981) ("Extortion consists of the
use of wrongful means (force, violence, or fear thereof) to
achieve an otherwise proper objective (satisfaction of a
legitimate debt); or use of an otherwise proper means (fear of
economic loss) to achieve a wrongful objective (obtaining
property to which there is no legal entitlement).").  Here, in
the context of the defendant's loansharking business and in light
of his reputation in the community, the calls between the
defendant the two debtors – including his message for Debtor #2
that "he's got to call me or I come over there," and his warning

34

to Debtor #3 that she had gotten herself "in trouble" and had
better "stop playing games" – represent implicit threats and
evidence of extortion.[19]

Second, the defendant's lengthy discussion of the
purported weaknesses in the government's Title III affidavits is
improper in the context of a bail proceeding and irrelevant to
the question whether he represents a danger to the community.
The government is prepared to litigate the legality of the
wiretap, which was twice authorized by a senior judge in this
district, should the defendant bring a motion to suppress.  Cf.
United States v. Petrizzo, No. 93-CR-1366, 1995 WL 129185, at *1
(E.D.N.Y. March 13, 1995) (denying bail motion and noting that
government's purported failure to comply with wiretap disclosure
requirements, "while pertinent to the suppression motion, is not
a reason for releasing the defendant").

Third, the defendant's contention that the government's
failure to arrest him earlier suggests that he is not a danger to
the community is untrue.  The government arrested the defendant
within days of the court-authorized search of his business that
yielded extensive evidence of his criminality.  As set forth
above, the evidence that the defendant is a danger to the

---

[19]     The defendant's contention that the government's
failure to indict him with respect to this conduct represents
some sort of concession of legality is both untrue and irrelevant
to the question of detention.

community is clear and convincing, and the defendant has failed to meet his burden of providing clear and convincing evidence to the contrary.

Similarly, the defendant's contention that the government's effort to detain him is punishment for his failure to cooperate is false and does not, in any event, outweigh the overwhelming evidence, and criminal history, warranting an order of detention from this Court.

Fourth, the defendant's reference to the decision of a judge in the Southern District of New York to grant him bail in a different case on different evidence is irrelevant.  As Judge Pauley noted in that case: "I make no determination whatsoever about the matters that are pending across the river in the Eastern District.  I trust that Judge Townes will make whatever determination she deems appropriate. . . . [T]he bail package that I fixed is the bail package that I believe is appropriate in this case before me and not any other case."  United States v. Virtuoso, 11-CR-546 (WHP) (S.D.N.Y. Sep. 16, 2011), at 18, attached hereto as Exhibit J.

C.   The Defendant's Motion Should Be Removed From ECF

As noted, the defendant's motion identifies by name the two individuals who were identified by the government in the original complaint as Debtor #2 and Debtor #3.  The government respectfully requests, pursuant to Fed. R. Crim. P. 49.1(e), that

36

the Court order the motion removed from ECF and refiled only after those names have been redacted.

The government is concerned that the public identification of these victims at this stage of the proceedings is unnecessary and may represent a threat to their personal safety.  More broadly, the government is concerned that the public identification of the defendant's victims may be construed as an implicit threat about the consequences of cooperating with the government or testifying against the defendant.  See, e.g., United States v. Khan, 538 F. Supp. 2d 929, 935 (E.D.N.Y. 2007) (noting that "the mere mention of the names of any potential or possible witnesses may compromise their safety and the safety of their family and friends, as well as chill the desire or willingness of these individuals-or of other possible witnesses-to testify"); cf. United States v. Basciano, 03-CR-929, 05-CR-060 (NGG), 2007 WL 4555892, *4 (E.D.N.Y. Dec. 19 2007) ("The decision to disclose the identities of Government witnesses is within the court's discretion, and public dissemination of the identity of a cooperating witness could endanger the witness's safety.") (citations omitted); United States v. Kelly, 07-CR-374 (SJ), 2008 WL 5068820, at *2 (E.D.N.Y. July 10, 2008) (prohibiting public disclosure of names or identifying information of alleged victim and government witnesses).  Indeed, the Second Circuit has noted that pretrial "concealment of the

37

identity of government witnesses," even from the defendant, is often appropriate in light of the fact that "intimidation of witnesses and subornation of perjury are not unknown, nor, for that matter, is actual injury to witnesses." <u>United States v. Cannone</u>, 528 F.2d 296, 301 (2d Cir. 1975) (citation omitted).

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the defendant's motion for release on bail pending trial be denied.  The government further requests that the Court direct the Clerk of the Court to remove the defendant's motion from ECF and order defense counsel to refile the motion only after the victims' names have been redacted.

Dated:      Brooklyn, New York
            September 27, 2011

                              Respectfully submitted,
                              LORETTA E. LYNCH
                              United States Attorney


                    By:   /s Stephen E. Frank
                          Stephen E. Frank
                          Assistant U.S. Attorney
                          (718) 254-6143


cc:  Joseph DiBenedetto, Esq.
     (By ECF w/o exhibits and U.S. Mail w/ exhibits.)